FILED
2006 Aug-29  PM 04:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JIMMY DEAN GIBSON,** | ) | |
| | ) | |
| **Defendant/Movant,** | ) | |
| | ) | **Case Numbers:** |
| **vs.** | ) | **CR 00-S-397-NE** |
| | ) | **CV 03-S-8009-NE** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

This matter is before the court on the motion of Jimmy Dean Gibson to vacate, set aside, or correct his conviction and sentence pursuant to 28 U.S.C. § 2255 (doc. no. 160). Upon consideration, the court finds that the motion is due to be denied.

### PART ONE

*Prior Proceedings*

The grand jury returned a six-count indictment against Jimmy Dean Gibson ("Gibson" or "defendant") and co-defendant Danny Wayne Johnson ("Johnson") on November 1, 2000. Count One charged that, from on or about December of 1999, until on or about February 4, 2000, Gibson and Johnson conspired and agreed with each other, and others, both known and unknown to the grand jury, to manufacture, possess with the intent to distribute, and to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), all in

violation of 21 U.S.C. § 846.  Count Two charged that, on or about February 4, 2000, Gibson and Johnson manufactured 50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).  Counts Three through Five charged only Gibson with possession of methamphetamine with the intent to distribute on February 4, 2000, December 27, 1999, and January 7, 2000, respectively.    Count Six charged Gibson with unlawfully distributing methamphetamine on January 12, 2000.  Counts Three through Six alleged violations of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 841(b)(1)(C).

## A.    Trial Proceedings

Gibson and Johnson were tried together, and the jury found both defendants guilty on all counts.  The evidence presented at trial was to the following effect:[1]

> Beginning in early December 1999, the Huntsville Office of the Federal Bureau of Investigation ("FBI") received information and developed a source relating to a methamphetamine manufacturing and distribution ring involving Jimmy Dean Gibson and others.  (R. 140)[2] Based on this initial information, agents of the FBI began to record conversations between Diane Swan and Gibson in an effort to set up purchases of methamphetamine from Gibson and determine his source(s).  (R. 140-42, 416)
>
> Diane Swan had known Gibson since February or March of 1999.

---

[1] The following summary is reproduced from the response of the United States to the subject motion.  It is an accurate account of the facts and evidence presented at trial.

[2] "R." refers to page numbers from the trial transcript.

(R. 405)  During their relationship, Swan became aware of Gibson's involvement with the manufacture of methamphetamine from their purchases of pseudoephedrine pills and matches in June or July of 1999. (R. 407-08)  According to Swan, she, Gibson, and others would purchase as many pseudoephedrine pills as possible, as well as, on occasions, 200 boxes of matches.  (R. 407-08)  Swan recalled two specific instances when she purchased matches and pills for Gibson.  (R. 407-09) After purchasing the matches, Swan, Gibson, and others would then clip the tips off of the matches and dip the striker plates in acetone to obtain the red phosphorous from them.  (R. 408-10)  The pseudoephedrine pills purchased in July or August 1999 were dissolved by Gibson in distilled water (R. 410) and were then cooked down to form a reddish powder (R. 411).  According to Swan, Gibson referred to the process of preparing the pseudoephedrine pills and matches as "making cough syrup." (R. 412) From June to August 1999, and before her contact with the FBI, Swan participated in the purchase of matches and/or pseudoephedrine pills and their subsequent preparation on several occasions at her residence and at other locations.  For each trip she made to purchase pills and matches, Gibson paid Swan $40.  (R. 412)

While Swan did not observe Gibson prepare or manufacture methamphetamine, she did observe him with finished methamphetamine.  (R. 411, 413-14)  Swan also observed Gibson bagging the methamphetamine and selling it.  (R. 414)  On one such occasion, in or about June of 1999, when Swan was assisting in the preparation of matches at the residence of Mary Harris, Swan saw Gibson show Danny Wayne Johnson, . . . , how to prepare for methamphetamine manufacture.  (R. 418, 419)  On that occasion, Swan observed Johnson arrive at the residence driving a Rent Way delivery truck from his place of employment.  (R. 419-20)

In early December of 1999, Swan contacted the FBI about Gibson's methamphetamine manufacturing activities.  (R. 141)  Swan was thereafter provided with recording equipment and tapes with which to record her conversations with Gibson to arrange purchases of methamphetamine from him.  (R. 141, 143-45, 416-18)  While working

3

with the FBI, Swan purchased methamphetamine from Gibson on December 27, 1999, January 7, 2000, and January 12, 2000.  (R. 421) Both the telephone conversations with Gibson regarding the purchase of methamphetamine and the meetings between Swan and Gibson where she purchased methamphetamine were recorded by Swan.  (R. 437) During her work with the FBI, Swan spoke with Gibson on an average of three to four times per day, or every other day leading up to the actual purchases.  (R. 439)

On December 27, 1999, Swan purchased one ounce of methamphetamine from Gibson for $100.  (R. 437)  Swan and Gibson had previously negotiated and agreed on the amount and purchase price. (R. 437-38)  This sale took place at Gibson's apartment in Good Hope, Alabama.  (R. 438, 448)  Analysis of the material purchased by Swan revealed it to be methamphetamine with a net weight of one gram.  (R. 375)

On January 7, 2000, Swan met Gibson at the San Ann gas station in Albertville, Alabama, and obtained one ounce of methamphetamine for $1600.  (R. 147, 151-52, 377, 440, 449)  According to Swan, the San Ann gas station was operated by Margaret Cochran.   (R. 439) Laboratory analysis revealed that the substance Gibson sold to Swan was methamphetamine with a net weight of 27.2 grams.  (R. 377)  The January 7th meeting and sale were also recorded.  (R. 147, 152, 438, 449)

On January 12, 2000, Gibson and Swan met at Swan's residence where Gibson delivered to Swan one ounce of methamphetamine in exchange for $1600.  (R. 146, 155, 378, 440-41)  Laboratory analysis revealed the substance Gibson sold to be methamphetamine with a net weight of 26.4 grams.  (R. 378)  This January 12th meeting and sale was also recorded.  (R. 146)

During a consensually recorded conversation between Swan and Gibson on January 13, 2000, Swan and Gibson discussed the prospect of Gibson teaching Swan how to manufacture methamphetamine.  (R. 451-52)  During this same conversation, based on previous discussions

4

Swan had with Gibson in which Gibson informed her that Johnson "watched his back" for "dirty cops" and the "feds," Swan asked about Johnson. (R. 453) Also during this conversation, Gibson and Swan discussed "yellow stuff" or pure, or uncut, methamphetamine (R. 453-54) and the fact that Gibson would provide a purchaser a discount for the methamphetamine, depending on the amount purchased. (R. 454-55)

Later on that same day – January 13, 2000 – Gibson provided Swan with a free sample of what he represented to be pure, uncut methamphetamine at his apartment. (R. 146-47, 158, 379, 441-42, 454-55) This methamphetamine was referred to as "yellow stuff." (R. 453-54) Laboratory examination of this material revealed it to be methamphetamine with a net weight of .33 grams. (R. 379) During another recorded conversation between Swan and Gibson on that same day, the two discussed the previous day's sale and the fact that the methamphetamine involved in that sale had weighed 27.8 grams and was supposed to have been one ounce. (R. 456)

Between February 2 and 4, 2000, Swan made several calls to Gibson, all of which were recorded, to arrange a purchase of one half of a pound of methamphetamine. (R. 457-58) During a conversation on February 2, 2000, Gibson informed Swan that the half pound of methamphetamine would be ready on Friday, February 4, 2000. (R. 457-58) On February 4, 2000, during a recorded telephone call, Gibson told Swan that he would have the methamphetamine later in the day, but he would only be able to deliver half of what Swan wanted, or a quarter of a pound. (R. 458-59)

During Swan's undercover work for the FBI, she also asked Gibson whether he needed her to purchase pseudoephedrine pills or matches as she had done previously. (R. 429) Gibson informed her at that time that he was purchasing his red phosphorous in bulk from California with the help of Johnson. (R. 420)

Tania Ballard (Cofield) spent the night of February 3, 2000 at Gibson's apartment located at 2381 County Road 439, Apartment D, in Good Hope, Alabama. (R. 165, 279) On that night, Gibson "cooked"

5

Sudafed pills at his apartment in Ballard's presence. (R. 281) After Gibson cooked the pills, the result was a pink-colored powder. (R. 282, 307) Ballard had, in the past, accompanied Gibson to various stores to purchase these pills. (R. 282-82)

The next morning, February 4, 2000, Ballard and Gibson first traveled to a Lowe's store to purchase plastic tubing. (R. 279-80, 308) At approximately 12:00 noon, Ballard and Gibson then traveled to the trailer of Danny Johnson, located at 331 County Road 845. (R. 165, 280) They took the tubing and cooked Sudafed pills with them to Johnson's trailer. (R. 282) On the way to Johnson's trailer, Ballard and Gibson stopped at a store and purchased starter fluid, Red Devil lye, cat litter, and bottled water. (R. 282-83)

When Ballard and Gibson arrived at Johnson's trailer at approximately 12:15 p.m., no one was present at the residence. (R. 283) Once there, Gibson began preparing to manufacture methamphetamine. Equipment used to manufacture methamphetamine, such as beakers, was already at Johnson's residence when Ballard and Gibson arrived. (R. 295-96, 309) While at Johnson's trailer, Gibson received a telephone call from Johnson, who indicated that he was leaving work and would be at the trailer in 10 to 15 minutes. (R. 291)

Approximately 20 minutes after Gibson and Ballard arrived at Johnson's trailer, Johnson arrived driving a Rent Way rental company truck from his employer. (R. 285) When Johnson arrived, he began to assist Gibson by preparing red phosphorous that he retrieved from a cabinet. (R. 285, 288) Johnson told Gibson that the red phosphorous had not dried completely, but that he had the red phosphorous from the night before. (R. 289) Ballard then observed Gibson and Johnson place the red phosphorous, Sudafed pills, and purified water into a large glass beaker and then place the beaker on the stove. (R. 289-90, 309) While the beaker was on the stove, Gibson kept the beaker iced or cooled-down with wet rags. (R. 290) During this process, Johnson was primarily cleaning items and burning coffee filters, cat litter, and plastic tubing. (R. 294-95) Johnson also cleaned the large beaker after it had cooled and tried to get the odor from the processing out of the trailer.

(R. 295)  Johnson was in a hurry to return to work, but he was told by Gibson that he (Johnson) would be paid for "it."  (R. 304)

After the items in the beaker were cooked, Gibson and Johnson added starter fluid and, then, Red Devil lye to the other ingredients.  (R. 292)  The material in the beaker was then siphoned into a plastic Coke bottle that Ballard had purchased earlier, and subsequently placed into a large glass bowl.  (R. 293)

At approximately 4:00 p.m., Gibson and Ballard left Johnson's residence and returned to Gibson's apartment.  (R. 296)  They took with them a duffel bag that Gibson had taken with him to Johnson's trailer earlier that day as well as the bowl that contained the cooked reddish-brown methamphetamine.  (R. 281, 296, 305)  Gibson carried the bowl of reddish-brown methamphetamine into his apartment.  (R. 297)

Back at Gibson's apartment, Gibson proceeded to cut the methamphetamine with Super B, which was already at the apartment. (R. 297-98)  Super B was used to cut methamphetamine and Ballard had previously purchased it for Gibson at a vitamin store in Decatur, Alabama.  (R. 298)  Gibson placed the glass bowl containing the reddish-brown methamphetamine on the stove. (R. 299)  He then placed some of the methamphetamine in the freezer and cut the remaining methamphetamine with the Super B, the cutting material; weighed it with a scale that was in the apartment; and, placed it in plastic bags for sale.  (R. 299-300)  While Ballard and Gibson were at Gibson's apartment that day, Gibson received calls from Diane Swan and Margaret Cochran, who worked in the San Ann gas station in Albertville, Alabama.  (R. 300)

On the evening of February 4, 2000, two federal search warrants were executed.  (R. 165-66)  One search warrant was executed on Gibson's apartment in Good Hope, Alabama, and the other was executed on Johnson's trailer in Cullman, Alabama, the two locations where the methamphetamine was being manufactured. (R. 165-66) The search of Johnson's trailer revealed an operational methamphetamine laboratory with all of the necessary glassware, equipment, and chemicals. (R. 179,

7

490, 492)

William Kent Glanville, a senior forensic chemist with the Drug Enforcement Administration's South Central Laboratory, went to Johnson's residence as a part of the search and investigation in this case. (R. 490)  Among the items found were:  glassware (R. 491); receipts for the purchase of matches (R. 18081); 182 grams of pseudoephedrine (R. 184, 217, 384, 490); Red Devil lye (R. 180); coffee filters with red stains (R. 183, 216, 490, 492) and methamphetamine residue (R. 383); iodine (R. 182, 382, 490); a set of digital scales (R. 180-85, 214); waste products from the manufacture of methamphetamine (R. 490); and, Polar Pure water purification kits (R. 180).  Discovered behind the residence was an area where items including match books and tubing had been burned.  (R. 294-95)  Glanville also observed a red pseudoephedrine powder at the residence and explained that the reason the powder was red was because the pills used to produce the powder were most probably red.  (R. 492)

Tania Ballard was present with Gibson at his apartment during the execution of the search warrant there.  (R. 166-67, 277-78)  The following were found in Gibson's apartment during the search: methamphetamine (R. 174, 237); razor blades (R. 173, 236); several sets of digital scales (R. 169, 171-72, 227, 229, 235); a chemistry book (R. 170, 227-28); money straps (R. 171-72, 227, 230); money wrappers (R. 227, 230); nicotinimide (Super N) (R. 176-77); and vitamin B (R. 167-77); along with bowls (R. 167) and baggies (R. 167).  The methamphetamine found in Gibson's apartment was bagged in separate bags (R. 147-175, 237) and had a total net weight of 237.3 grams (R. 381).  Also found during the search of Gibson's apartment was a Campmor catalog with an advertisement for Polar Pure water purification kits that was circled.  (R. 167, 170)

Subsequent to the execution of the search warrants on February 4, 2000, Mary and Ronald Harris turned additional items over to the FBI that they had found in the closet of the room in which Gibson had resided when he resided with Ms. Harris in 1999.  (R. 185-91, 256-58)  Mr. Harris turned over a large cardboard box with a "Campmor" mailing

label (R. 186, 265-66), containing clothing (R. 187), a receipt from Campmor for the purchase of 40 Polar Pure water purification kits (R. 187), and several empty boxes of Polar Pure water purification kits (R. 188-89). Harris later turned over to the FBI coffee filters (R. 190); tubing (R. 190, 258); lye (R. 191, 258); and, razor blades (R. 191, 258), that were also found in the closet of Gibson's room (R. 258).

(Doc. 165 at 2-10).

## B.    Sentencing

Gibson was sentenced on April 20, 2001, to a term of life imprisonment for the offense of conviction alleged in Counts One, Two, and Three of the indictment, and thirty years on each of the remaining offenses of conviction (Counts Four through Six). Gibson's sentence included the imposition of a ten year term of supervised release, and an order to pay $3,634.75 in restitution, and a special assessment fee in the aggregate amount of $600. The court further ordered that Gibson's sentences run consecutively to the state court sentences he then was serving.

## C.    Motions for New Trial

Following trial, Johnson filed two motions for a new trial. After a hearing on March 29, 2001, this court denied Johnson's first motion for a new trial as amended. Johnson filed a second motion for a new trial on December 11, 2001, alleging newly discovered evidence. The "newly discovered evidence" consisted of an affidavit executed by one of the witnesses who was called to testify at trial by the United

States, Tania Louise Ballard ("Ballard").  In that affidavit, Ms. Ballard recanted her trial testimony, and stated that she had not been with either Gibson or Johnson on February 4, 2000, and that she did not observe them manufacture methamphetamine on that date, as she had testified.  (*See* Ex. 1).[3]  In compliance with an order of this court, the United States filed a written response to Johnson's motion (*see* Ex. 2).  The United States subsequently filed a supplemental response, asserting that Ballard had "recanted her recantation" (*see* Ex. 3).  This supplemental response was premised on an interview with Ballard by an agent of the Federal Bureau of Investigation ("FBI"), during which she stated that she did not prepare the affidavit submitted by Gibson in support of his second motion for new trial (*id*. at 1).  The motion was set for an evidentiary hearing that was conducted on January 11, 2002.  After the hearing, the court denied defendant's second motion for a new trial (Ex. 5).

## D.     Direct Appeal

Gibson and Johnson filed timely appeals from their convictions and sentences. Gibson asserted, among other things, that a *Giglio* violation occurred when Ballard admitted at trial to having lied before the Grand Jury.[4]  The Eleventh Circuit rejected

---

[3] References to "Ex. ___" are to the exhibits submitted by the respondent that are found at document 165.

[4] Criminal defendants have a constitutional, due process right to disclosure of evidence that is "favorable to the accused" and "material either to guilt or to punishment," *Brady v. Maryland*, 373 U.S. 83, 87 (1963), *as well as* evidence that could impeach the credibility of government witnesses.

the defendants' arguments, and affirmed their convictions and sentences in an unpublished opinion. *United States v. Johnson and Gibson*, No. 01-12306 (11th Cir. Jan. 7, 2002) (Ex. 6). The Court of Appeals specifically found that Gibson failed to identify any false testimony at trial and failed to establish the knowing use of perjured testimony by the government (*id.* at 3).

## PART TWO

### *The Present Motion*

Gibson again asserts in his present motion that Ballard offered false and perjured testimony at trial, and that she was forced to testify in the manner she did by the United States and an agent of the FBI. In support of his argument, Gibson attached what purports to be a second affidavit executed by Ballard, in which she states that: she knowingly provided false testimony at Gibson's trial; she was instructed by law enforcement officials of the FBI and the United States Marshals

---

*Giglio v. United States*, 405 U.S. 150, 154 (1972); *see also United States v. Bagley*, 473 U.S. 667, 676 (1985) (holding that both impeachment and exculpatory evidence fall within the *Brady* rule). These rights are independent of the Federal Rules of Criminal Procedure and the *Jencks Act*, and may result in reversal of a conviction if a defendant demonstrates that there is a "reasonable probability" that disclosure of the evidence would have changed the outcome of the proceeding. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also id.* at 678 (holding that "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial"). *Cf. Strickland v. Washington*, 466 U.S. 668, 694 (1984) (defining a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome").

Service to testify falsely; she was threatened; and she was told by the prosecutor how to answer questions and how to testify. The affidavit purports to bear the signature of Ballard and it is notarized. Gibson asserts that, since Ballard recanted her trial testimony, his conviction can no longer stand because she was the sole reason for the jury's verdict and his conviction. (*See* Defendant's Memorandum in Support of § 2255 Motion.[5]) In response, the government asserts that the record of the trial and subsequent proceedings does not support Gibson's reasoning. (*See* Response at 12.) Gibson filed a reply asserting that the hearing in Johnson's case "has no bearing" on his pending motion. (Reply at 1.[6]) Specifically, he states:

> Miss Ballard's testimony is that she saw movant began [sic] preparing to manufacture methamphetamine. Miss Ballard further states that the equipment used to manufacture methamphetamine was already at Danny Johnson's trailer. Miss Ballard's testimony was the only testimony the Government could produce of an eye witness who placed your movant at Danny Johnson's trailer. Miss Ballard's testimony caused your movant to receive three (3) life sentences for conspiracy to manufacture, manufacture 50 grams or more of methamphetamine, possession with the intent to distribute. Did the petit JURY WHICH HEARD THIS FALSE TESTIMONY BECOME PREJUDICIAL [sic] to your movant and find him guilty because of said testimony. [sic]

(Reply at 2 (emphasis in original).) Gibson also filed a motion to supplement the record, to include a handwritten statement by Amy Hancock, stating that she

---

[5] The Memorandum is located at document 160 with the defendant's motion to vacate.

[6] The defendant's reply is located at document 167.

12

notarized Ballard's affidavit.  (Doc. no. 168.)   Specifically, Hancock states that

Ballard "approved said Affidavit and [it] was given by her own free will and that at

no time was she threatened or placed under any duress by any outside parties."  (*Id*.

at Hancock Statement).

Gibson also filed a second motion to supplement or expand the record and for

an evidentiary hearing.  (*See* doc. no. 175.)   Included with the motion are three

statements.  The first is from Kimberly Pack, and it is dated January 19, 2004.  She

states:

> I Kimberly Pack was present on January 4, 2003, when Tania
> Ballard signed the affidavit stating that she lied at Jimmy Gibson &
> Danny Johnson's trial.  Tania Ballard has lived in my home on & off for
> the last five years.  I know for a fact that Tania wanted to tell the truth
> on behalf of Jimmy & Danny.  Tania stated several times that it made
> her sick to think her testimony put them in prison.  She is extremely
> scared of the FBI.  The FBI scares [sic] her into thinking by telling the
> truth on behalf of Jimmy & Danny that she would loose [sic] her
> children.  That fear is the only reason Tania has not come forth before.
> She told me herself she needed to do the right thing & admit she lied at
> trial.

(Doc. no. 175 at Pack Statement.)

The second statement is from Laura Reeves, and it is dated January 19, 2004.

It states that she was present when Ballard signed the affidavit, and that Ballard was

not under the influence of any drugs or "anything else."  (Doc. no. 175 at Reeves

Statement.[7]  She next states that Ballard gave the  affidavit "on her o[w]n."  (*Id.*).

Reeves also states that she has not given or promised Ballard "money, drugs or

anything else for her to change her testimony."  (*Id.*).  Reeves further asserts that

Ballard "wants to tell the truth but whenever the FBI talks to her she gets scared and

then she says what they want her to say."  (*Id.*).  Reeves then concludes by asserting,

"I don't know why she lies, she says she's scared of the FBI."  (*Id.*).

The third statement is from the defendant himself.  Gibson explains how he was

pleasantly "surprised" in January of 2002, when he received the affidavit from Ballard

recanting her trial testimony.  (Doc. no. 175 at Gibson Affidavit ¶ 6.)  He reiterates

that Ballard had earlier told him that she was sorry "for lying for the Government,"

and that she was scared because the FBI agents told her that her  child could be taken

away from her and she could go to prison if she did not lie.  (*Id.* at ¶ 4.)  He concludes

by stating that, if he had testified at trial, he "would have categorical[ly] denied

having manufactured drugs . . . ."[8]  (*Id.* at ¶ 8.)

---

[7] The statements from Pack and Reeves are not "affidavits" in the usual sense because they
are not "sworn to" and the purported notary (Hancock) has not affixed any indicia of her authority
under State law other than a terse reference that his is a notary public.  The court, however, has
considered the documents in disposing of the defendant's motion to vacate.  Even if the statements
had been submitted in the correct format, the result would be the same.

[8] This is consistent with his testimony at the hearing on the motion for a new trial filed by
Johnson.  (See Doc. 94 at 16).

**PART THREE**

*Discussion*

The government argues that the defendant's claim is barred from further review because it has previously been raised before this court and the Eleventh Circuit Court of Appeals, and decided adversely to the defendant. (Response at 13.) Specifically, the government asserts that Johnson raised this matter in his motion for a new trial and, after an evidentiary hearing at which Ballard testified "that she had in fact testified truthfully at trial and the affidavit was false and was made at the urging of Gibson's family members, the District Court denied Johnson's Motion." (*Id.*) Additionally, prior to the evidentiary hearing held in this court on March 29, 2001,

> Ballard was interviewed by FBI agents concerning the affidavit she had filed. Ballard stated that a Larue Reeves, a close friend and relative of Gibson, had been hounding her about the sentences Gibson and Johnson had received and told her that Gibson had tried to have another government witness killed.

(*Id.*) Ballard also stated that "Reeves wrote the affidavit [recanting the trial testimony] and Ballard had signed the affidavit while under the influence of drugs." (*Id.*)

The government goes on to assert that Gibson raised the same issue on direct appeal, "arguing that because [Ballard] admitted to lying before the grand jury on

cross examination at trial, the government knowingly used perjured testimony to secure his conviction." (*Id.*)  The government further states that the "Court of Appeals specifically rejected this argument holding that Gibson 'failed to identify any false testimony during trial, and failed to establish knowing use of perjured testimony by the prosecution.'" (Response at 13-14 (citing Ex. F at 3, and quoting *United States v. Dickerson*, 248 F.3d 1036, 1041-42 (11th Cir. 2001)).)  The government concludes by stating that:

> In his present Motion to Vacate, Set Aside or Correct Sentence filed pursuant to Title 28, United States Code, Section 2255, Gibson, while offering a more detailed affidavit of Tania Ballard wherein she purports to recant her trial testimony again, has presented this Court with nothing more than was previously presented to this Court and the Court of Appeals and was flatly rejected.  This same line of argument was specifically rejected by this Court in Johnson's Motion for New Trial and by the Court of Appeals on direct appeal.  Given the fact that the Court of Appeals specifically found that the trial testimony of Ballard could not be identified as false and there was no use of perjured testimony, the new affidavit of Ballard, making the same allegations previously raised and withdrawn, cannot now support Gibson's claims. Ballard's new affidavit presents this Court with nothing new.

(*Id.* at 14.)

Although this same issue was raised by Johnson, it has not previously been raised by Gibson.  On direct appeal, Gibson did present a *Giglio* challenge concerning Ballard.  However, that challenge addressed Ballard's trial testimony concerning the issue of whether she had *sold* drugs *for Gibson*, and not whether she had been present

16

when methamphetamine was being manufactured. (*Compare* Ex. F at 2 *with* Motion at Ballard Affidavit.) Thus, the court concludes that Gibson's present contentions are not barred from substantive review.

## A.      The Merits of Gibson's Motion

As noted by the government, "[c]laims of perjury or falsification of evidence do not rise to the level of constitutional claims, and, consequently, are not cognizable on collateral attack, absent a showing that the prosecutor knowingly used material perjured testimony or false evidence in securing petitioner's indictment or conviction." (Response at 15.) In order to succeed on such a claim, it must be shown that the prosecution knowingly used or introduced false testimony, *and*, that there is a reasonable likelihood that the false testimony prejudiced the defendant's rights. *See United States v. Caporale*, 806 F.2d 1487, 1514 n.29 (11th Cir. 1986).

Gibson is entitled to no relief in the present matter because this court previously evaluated the same allegation in regard to co-defendant Johnson, and determined that Ballard's testimony at trial was not false. (Ex. 5.) Ballard unequivocally testified at Johnson's evidentiary hearing that her trial testimony was the truth "and nothing but the truth." (Doc. no. 178 (Johnson Hearing Transcript), at 37.) Nowhere in the most recent Ballard affidavit does she recant the testimony she gave under oath at that evidentiary hearing. The latest affidavit is only a slightly

more detailed version of Ballard's original affidavit, which she recanted.  This court,

therefore, does not find Ballard's current affidavit sufficient to warrant another

evidentiary hearing, or any relief for this defendant.

This court again agrees with counsel for the United States that the recantation

claim, and the affidavit submitted in support thereof, must be viewed with great

caution.  *See United States v. Santiago*, 837 F.2d 1545 1550 (11th Cir. 1988); *United

States v. DeVoe*, 493 F.2d 776, 780 (5th Cir. 1974);  *Newman v. United States*, 238

F.2d 861, 862 (5th Cir. 1956).[9]  Additionally, relief is warranted only when a court

is reasonably well satisfied that the testimony given by a material witness is false, and

that, without the perjured testimony, the jury probably would have reached a different

conclusion.  *See United States v. Smith*, 433 F.2d 149, 150 (5th Cir. 1970).  The

Supreme Court addressed the reliability of recantations in *Dobbert v. Wainwright*,

468 U.S. 1231 (1984), saying:

> Recantation testimony is properly viewed with great suspicion.  It upsets
> society's interest in the finality of convictions, is very often unreliable
> and given for suspect motives, and most often serves merely to impeach
> cumulative evidence rather than to undermine confidence in the
> accuracy of the conviction.  For these reasons, a witness' recantation of
> trial testimony typically will justify a new trial only where the reviewing
> judge after analyzing the recantation is satisfied that it is true and that it

---

[9] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), the Eleventh
Circuit adopted as binding precedent all decisions of the Fifth Circuit entered prior to the close of
business on September 30, 1981.

will "render probable a different verdict."

*Id.* at 1234 (quoting *Brown v. State*, 381 So. 2d 690, 692-93 (Fla. 1980)). The Eighth

Circuit also has held that motions based on alleged recantations of material witnesses

"should be viewed with disfavor," because "[t]he stability and finality of verdicts

would be greatly disturbed if courts were too ready to entertain testimony from

witnesses who have changed their minds, or who claim to have lied at the trial."

*United States v. Grey Bear*, 116 F.3d 349, 350 (8th Cir. 1997). The *Grey Bear* Court

also said that, if the recantation cannot be believed, it is unlikely that the same court

would find the witness sufficiently persuasive to enable the court to say that the

witness' testimony would probably produce an acquittal at a new trial. *Id.* at 351.

When this court evaluated Ballard's first recantation during 2001, it found the

same to be insufficient to warrant any relief. (Ex. 5.) The present situation is no

different. As correctly stated by counsel for the government

> Ballard's testimony at trial was marked by striking consistencies with
> physical evidence recovered from Johnson's residence and Gibson's
> apartment. She was aware of and knew intricate details surrounding the
> day's events. She testified that the pseudoephedrine Gibson prepared
> the night before produced a pink powder. Pink pseudoephedrine powder
> was recovered from Johnson's residence. She described in great detail
> the type of glassware used in the manufacture, photos of which were
> introduced into evidence. She testified that she and Gibson had
> purchased items at Lowe's before arriving at Johnson's residence,
> photographs of some of those items were identified by her and
> introduced into evidence at trial. She testified as to Johnson burning

items behind the residence, and photos of this burn site were also admitted into evidence. She testified that she and Gibson transported the methamphetamine back to Gibson's apartment after the manufacturing process. She was present with Gibson in his apartment when Gibson was arrested and the methamphetamine seized.

Ballard's recantation is totally inconsistent with the detail and depth contained in her trial testimony. If Ballard was going to lie or did in fact lie at trial and, therefore, was not present with Gibson and Johnson and did not observe the manufacture, how would she know to say the pseudoephedrine powder was pink, be able to describe in exacting detail the glassware and equipment used, the fact that water purification kits were the source of the iodine used in the manufacturing process, the fact that Johnson was burning items behind the residence, and be able to describe the day's events in such exacting detail without having been at Johnson's residence or without having seen either the photographs or physical evidence before trial, which she did not. How would she know to say that the bottle of Super B vitamin Gibson used to cut his methamphetamine with, which Ballard testified she purchased for Gibson on one occasion and which was found in his apartment, was contained in a white bottle with an orange label if she had not in fact made such a purchase. If Ballard was lying at trial and was not present and did not observe that which she testified she did observe, how did the physical evidence match her testimony so closely[?] The nature, detail and consistency of Ballard's trial testimony simply establishes that she could not have been lying at trial but has again fabricated her recantation. Without having actually been present with Gibson and Johnson at Johnson's residence on February 4, 2000, and observing the manufacture and the items used therein Ballard could not have testified as she did.

(Response at 17-19.)

Additionally, there is no evidence that the prosecution knew of any false testimony and knowingly used the same at trial. Specifically, the affidavit states that

the prosecutor "told me how to testify," and "told me what Jimmy Gibson's lawyers would ask me and then told me how to answer their questions." (Ballard Affidavit.) This evidence is typical of customary witness preparation for both direct and cross-examination, and does not warrant an inference that the prosecution attempted to elicit false testimony.

Further, even if Ballard's latest recantation is true, and she did lie during her trial testimony, the court is satisfied that defendant still is entitled to no relief. The evidence of prejudice is insufficient under the circumstances. Ballard's purportedly false testimony concerns a very limited portion of the illegal conduct charged. It relates only to the events occurring on February 4, 2002, at Johnson's trailer. It does not impact the other substantial evidence, including: the physical evidence recovered at Johnson's residence and Gibson's apartment; the testimony of Diane Swan; the tape recordings presented to the jury; and, the testimony of other witnesses. As noted by the government, Gibson's defense counsel was able to impeach Ballard before the jury concerning her grand jury testimony. Based on the instructions given by the court, the jury certainly was free to disregard her testimony, in whole or in part. The court fails to see how this additional information would have impacted the verdict returned against Gibson.

In evaluating this claim, the court has examined the statements submitted by

Kimberly Peck, Larue Reeves, and Gibson himself with the motion to supplement and expand the record. (Doc. no. 175.) Nothing contained therein alters this court's determination of the merits of the defendant's motion.

## CONCLUSION

Premised on the foregoing, Jimmy Dean Gibson's motion to vacate, set aside, or correct his conviction and/or sentence (doc. no. 60) is due to be summarily denied. His motions to supplement the record (doc. nos. 168 and 175) are due to be granted to the extent that the court has considered the attached documents in resolving the present motion to vacate. An appropriate order will be entered.

DONE this 29th day of August, 2006.

_____
United States District Judge